# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 2, 2019

Lyle W. Cayce
Clerk

No. 14-20249

———————

BOBBY R. BROWN, individually and on behalf of all others similarly situated,

        Plaintiff—Appellee,

WILLIAM E. SCOTT,

        Intervenor Plaintiff—Appellee,

TYRONE DAY; KENNETH HICKMAN; R. WAYNE JOHNSON; TORRANCE FLEMINGS; KENNETH PRYOR; JULIAN A. RANDALL; LONNIE DEAN COLLINS; LAMONT EDWARD WILSON,

        Intervenor Plaintiffs—Appellees,

v.

BRYAN COLLIER, Executive Director of the Texas Department of Criminal Justice,

        Defendant—Appellant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

consolidated with 14-20444

BOBBY R. BROWN, individually and on behalf of all others similarly situated,

        Plaintiff—Appellee,

TYRONE DAY; KENNETH HICKMAN; R. WAYNE JOHNSON; TORRANCE FLEMINGS; KENNETH PRYOR; JULIAN A. RANDALL; LONNIE DEAN COLLINS; LAMONT EDWARD WILSON,

        Intervenor Plaintiffs—Appellees,

No. 14-20249
c/w No. 14-20444

v.

BRYAN COLLIER, Executive Director of the Texas Department of Criminal
Justice,

        Defendant—Appellant.

————————————

Appeals from the United States District Court
for the Southern District of Texas

————————————

Before KING, DENNIS, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge, joined by KING, Circuit Judge, in Parts
I, II, III, IV, V and VII:

Pursuant to a provision of the Prison Litigation Reform Act (PLRA),[1] the
Texas Department of Criminal Justice (TDCJ) seeks to terminate a consent
decree entered in 1977, which exempts Muslim inmates from the requirement
that all religious gatherings and activities in Texas state prisons attended by
more than four inmates must be directly supervised by either prison staff or a
prison-approved outside volunteer. The district court denied the motion in
part, concluding that a portion of the consent decree remains necessary to
correct current and ongoing violations of the Religious Land Use and
Institutionalized Persons Act (RLUIPA),[2] the Free Exercise Clause of the First
Amendment, and the Establishment Clause of the First Amendment. We
reverse and terminate the 1977 consent decree.

---

[1] 18 U.S.C. § 3626(b).
[2] 42 U.S.C. § 2000cc, *et seq*.

No. 14-20249
c/w No. 14-20444

**I**

More than forty years ago, Bobby Brown (Brown), a Muslim, initiated a class action against the executive director of TDCJ that resulted in the 1977 consent decree. That decree required TDCJ to make an exception for Muslim inmates to a policy that otherwise applied to those attending religious activities. TDCJ's rules and policies have required religious worship services or study gatherings attended by more than four inmates to be "directly" supervised by either prison staff, which would include a chaplain employed by TDCJ, or a prison-approved outside volunteer.[3] Direct supervision means that either a TDCJ employee or a qualified volunteer is in the room during the religious activities at all times and is supervising only those activities, with no responsibility for supervising other areas of the prison or other inmates until the activities have concluded.[4] However, when a volunteer is supervising or leading the religious gathering, a TDCJ officer "will be roving the hallways checking on the offenders, checking on the volunteers."[5] If an officer is not available, the service or activity will be cancelled, even if a volunteer is scheduled to be present.[6]

The 1977 consent decree afforded Muslim inmates the right to participate in group religious services and studies that were "indirectly" supervised if no prison staff member or outside volunteer was available for direct supervision.[7] Indirect supervision means that a prison staff member is in the vicinity and observes the religious gathering intermittently, through windows or by the use of audio or video equipment, but does not remain present

---

[3] *Brown v. Livingston*, 17 F. Supp. 3d 616, 619 (S.D. Tex. 2014).

[4] ROA 1432.

[5] ROA 2488-89.

[6] ROA 2489.

[7] *See Brown*, 17 F. Supp. 3d at 620.

No. 14-20249
c/w No. 14-20444

in the room or area where the activity is occurring.[8]  The consent decree also provided that adherents to the Religion of Islam must be allowed "equal time for worship services and other religious activities each week as is enjoyed by adherents to the Catholic, Jewish and Protestant faiths," and the decree said that TDCJ must "specifically, allow adherents to the Religion of Islam at least two (2) full hours of time for worship services or other religious activities each week, rather than the one (1) hour previously permitted."[9]  In the present proceedings, the district court found that from 1977 until January 1, 2013, Muslim, Jewish, Catholic, Protestant, and Native American inmates could engage in an average of six hours of religious activities each week at units in which members of each of these faith groups were housed.[10]

However, members of other faiths were not permitted to gather as frequently due to the lack of civilian volunteers.  William Scott, a Jehovah's Witness, sued the director of TDCJ in federal district court in 2009, seeking an injunction ordering prison officials to allow him and other members of the Jehovah's Witness faith to meet without volunteers, just as Muslims were permitted to do as a result of the consent decree.  The district court's 2012 opinion and order in the *Scott* suit reflected that there were 217 offender faith preferences represented in the TDCJ system, and 59 designated faith groups at the Huntsville Unit, where Scott had been confined for a period of time.[11]  TDCJ asserted that it did not have sufficient staff to provide adequate supervision of all offender faith groups if they were allowed to meet without

---

[8] *Id.* at 621.
[9] ROA 40.
[10] *Brown*, 17 F. Supp. 3d at 621.
[11] *Scott v. Pierce*, No. 4:09-CV-3991, 2012 WL 12535442, at *1 (S.D. Tex. May 7, 2012) (unpublished).

volunteers present.[12]  The district court held in *Scott* that the Establishment Clause requires "denominational neutrality," its "prohibition against preferential treatment of religion is 'absolute,'" and that Muslim inmates "are preferred to Jehovah's Witnesses with respect to the volunteer policy."[13]  The court concluded "[i]f alternative means exist to treat Muslim and Jehovah's Witness prisoners without favoritism, then the Establishment Clause demands them."[14]  The district court concluded that injunctive relief based on the Establishment Clause violation was warranted but did not enter an injunction at that time.  It instead ordered the Executive Director of TDCJ "to propose a method of compliance" within sixty days.[15]  The district court's opinion in *Scott* observed that "if Muslims regularly engage in communal worship without an approved religious volunteer present, evidence exists that the government's rule against Jehovah's Witnesses' meetings is not 'closely fitted' to the government's compelling interest in enforcing the [*Brown*] consent decree."[16]

In the *Scott* litigation, Scott had also requested injunctive relief under RLUIPA.  The district denied that request, reasoning that "the accommodation of an offender's religious or spiritual needs does not outweigh a prison's need to maintain order and safety,"[17] that "due deference" is to be given to prison administrators regarding "good order, security and discipline, consistent with consideration of costs and limited resources," and "that a rational connection

---

[12] *Id.* at *2.
[13] *Id.* at *3.
[14] *Id.* at *8.
[15] *Id.* at *5.
[16] *Id.* at *4.
[17] *Id.* at *6.

exists between" requiring directly supervised religious gatherings "and the government's legitimate interest in prison security."[18]

TDCJ responded to the district court's decision in *Scott* by promulgating Administrative Directive AD-07.30 (rev. 7) (June 30, 2014), which the parties refer to as the "Scott Plan." Under the Scott Plan, all religious gatherings of more than four inmates require direct supervision, including worship and studies by more than four Muslim inmates.[19] The Scott Plan conflicts with the 1977 consent decree that permitted Muslim inmates to congregate with only indirect supervision. Under the Scott Plan, each religious group is permitted to have a group worship service for one hour per week that is directly supervised by prison staff. Additional group religious activities are permitted if supervised by an outside, authorized volunteer.[20]

In the present case, and as a result of the district court's conclusion in the *Scott* case that TDCJ had violated the Establishment clause by preferring adherents to the Religion of Islam over the Jehovah's Witness faith group, TDCJ moved to terminate the 1977 *Brown* consent decree pursuant to the PLRA.[21] The PLRA provides that "in any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervenor," if the order has been in effect for a certain period of time, unless "the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to

---

[18] *Id*. at *6.

[19] *Brown v. Livingston*, 17 F. Supp. 3d 616, 619 (S.D. Tex. 2014).

[20] *Id*. at 623; *see* ROA 3080, 3284-85, 4105.

[21] ROA 72-82.

6

No. 14-20249
c/w No. 14-20444

correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."[22]

Pursuant to provisions of the PLRA, TDCJ's motion operated as an automatic stay of the 1977 *Brown* consent decree,[23] allowing TDCJ to implement the Scott Plan pending further proceedings in the district court. Accordingly, the direct supervision requirement for all religious groups in TDCJ prisons, including members of the Religion of Islam, went into effect in 2013.[24]

After the implementation of the Scott Plan, Muslim inmates may attend a weekly, one-hour Jumu'ah service directly supervised by TDCJ chaplains or employees, but opportunities for Muslim prisoners to participate in other communal worship or studies diminished due to a dearth of Muslim volunteers from outside the prison system.[25]    Protestant and Catholic prisoners, by contrast, maintained the ability to engage in group worship or study in addition to the one-hour, weekly service directly supervised by TDCJ-employees because of a relative abundance of outside volunteers.[26]

The district court held an evidentiary hearing on TDCJ's motion to dissolve the 1977 decree.   That decree had twenty-two specific provisions, twenty of which the district court terminated without objection by any party. But the district concluded that two provisions were necessary to correct current and ongoing violations of the federal Constitution and to give effect to statutory rights of Muslim inmates, effectively rejecting the Scott Plan as it applies to

---

[22] 18 U.S.C. § 3626(b)(2)-(3).
[23] *Id*. § 3626(e).
[24] ROA 3077.
[25] ROA 1951, 1953.
[26] ROA 1953.

7

Muslim inmates.[27]  One of the two provisions of the 1977 consent decree that the district court refused to dissolve, found in section III(15) of the decree, required TDCJ officials to "[a]llow adherents to the Religion of Islam at each unit of the Texas Department of Corrections equal time for worship services and other religious activities each week as is enjoyed by adherents to the Catholic, Protestant and Jewish faiths."[28]  The other provision that the district court ordered be left intact is found in section III(8) of the consent decree, which required TDCJ officials to permit inmates professing adherence to the Religion of Islam to congregate for worship, study, and other religious functions and activities under the supervision of an inmate leader whenever an ordained Islamic minister is unavailable at a regularly scheduled time for worship and study.[29]

The district court focused on three required practices of the Islamic faith—Jumu'ah, Taleem, and Qur'anic studies—that necessitate group gathering.[30]  The district court concluded that the one hour of direct supervision per week allotted to the roughly 6,775 Muslim inmates in Texas state prisons by TDCJ staff under the Scott Plan is not enough time to meet the requirements of Jumu'ah, Taleem, and Qur'anic studies,[31] and that the number of Muslim chaplains employed by the TDCJ, and of available Muslim volunteers, is insufficient to provide adequate group study and worship.[32]  The district court found that by contrast, Christian inmates are able to attend an average of six hours of religious gatherings per week, due to the large number

---

[27] *See* ROA 1979-80.

[28] ROA 40

[29] ROA 36-37.

[30] ROA 1956-58.

[31] ROA 1951, 1958.

[32] ROA 1951, 1958.

No. 14-20249
c/w No. 14-20444

of Christian volunteers available to supervise such assemblages directly.[33] The court concluded that "Jewish inmates are specifically assigned to units" that are in closer proximity to prospective volunteers, and Native American inmates are assigned to a specifically designated unit to facilitate access to one another and to enhance Native American religious activities.[34] The TDCJ has not assigned Muslim prisoners to specifically designated units.[35]

The district court held that the Scott Plan and its direct supervision requirement result in violations of three different federal rights. Specifically, the district court held that the Scott Plan (1) unjustifiably imposes a substantial burden on Muslim inmates' religious exercise, thereby violating RLUIPA;[36] (2) restricts Islamic religious exercise in violation of the Free Exercise Clause of the First Amendment;[37] and (3) disfavors Islam and favors other faiths, violating the Establishment Clause of the First Amendment.[38] Subsequently, the district court awarded attorneys' fees in favor of Brown and a group of Muslim inmates who intervened in the case (the Inmate Intervenors) as prevailing parties.[39]

The TDCJ appeals both the district court's denial of its motion to terminate the consent decree and the award of attorneys' fees. A motions panel of this court ordered that the district court's judgment on the merits be stayed pending appeal.[40]

---

[33] ROA 1953.
[34] ROA 1964-65.
[35] ROA 1965.
[36] ROA 1975-77.
[37] ROA 1970-75.
[38] ROA 1966-70.
[39] ROA 2021.
[40] *Brown v. Livingston*, No. 14-20249, Doc. No. 32 (5th Cir. May 20, 2014); *see also Brown v. Livingston*, No. 14-20249, Doc. No. 61 (5th Cir. June 5, 2014) (denying reconsideration).

No. 14-20249
c/w No. 14-20444

## II

We have held that "[t]he application of the relevant sections of the PLRA requires the district court to make a finding of an ongoing constitutional violation, which is a mixed question of law and fact,"[41] and that "[w]e review mixed questions of law and fact de novo."[42] with the definite and firm conviction that a mistake has been committed.'"[43]

## III

"The PLRA strongly disfavors continuing relief through the federal courts; indeed, its fundamental purpose was to extricate them from managing state prisons."[44]  As noted above, prospective relief like the consent decree at issue in this case must be terminated on the motion of any party unless such relief "remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and . . . is narrowly drawn and the least intrusive means to correct the violation."[45]  The 1977 consent decree applies to the entire TDCJ prison system and "terminates unless the district court makes [the requisite]

---

[41] *Castillo v. Cameron Cty.*, 238 F.3d 339, 347 (5th Cir.2001) (citing *Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 661 (1st Cir. 1997)); *see also Ruiz v. United States*, 243 F.3d 941, 950 (5th Cir. 2001).

[42] *Castillo*, 238 F.3d at 347 (citing *Cargill, Inc. v. United States*, 173 F.3d 323, 333 n.13 (5th Cir. 1999)).

[43] *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)) (alteration in original); *id.* at 573-74 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

[44] *Guajardo v. Tex. Dep't of Criminal Justice*, 363 F.3d 392, 394 (5th Cir. 2004) (per curiam) (citation and internal quotation marks omitted).

[45] 18 U.S.C. § 3626(b)(2)-(3).

findings" and "also finds ongoing, system-wide violations."[46] We have held that "the burden of proof to support these findings is obviously on the party opposing termination."[47]

The district court found violations of RLUIPA, the Free Exercise Clause, and the Establishment Clause. It is important to bear in mind in our analysis that our focus ultimately remains on the PLRA. No inmate has brought a free-standing claim that he is entitled to injunctive relief under RLUIPA or the Constitution.

The relief granted by the district court was not limited to continuing the 1977 Consent Decree in effect. The PLRA does not authorize the district court to expand the consent decree. The district court erred in doing so. The remaining inquiry under the PLRA is whether there is an ongoing violation of a federal right.

## IV

We first consider RLUIPA. It states, in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.[48]

---

[46] *Guajardo*, 363 F.3d at 395.

[47] *Id*. at 396.

[48] 42 U.S.C. § 2000cc-1(a).

No. 14-20249
c/w No. 14-20444

RLUIPA prevents government practices that substantially burden the religious exercise of an inmate unless the practice furthers a compelling governmental interest and is the least restrictive means of doing so.

Initially, "it falls to the plaintiff to demonstrate that the government practice complained of imposes a 'substantial burden' on his religious exercise."[49]  To demonstrate a substantial burden, "the plaintiff must show that the challenged action 'truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs.'"[50]  If the inmate makes this showing, the burden shifts to the government "to show that its action or policy is the least restrictive means of furthering a compelling interest."[51]  In making this assessment, we must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."[52]  However, the Supreme Court has made clear that even when prison regulations are at issue, "RLUIPA requires [courts] to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants' and 'to look to the marginal interest in enforcing' the challenged government action in that particular context."[53]

The district court held that (1) Muslim prisoners' religious exercise is "substantially burdened" by the Scott Plan's direct supervision requirement

---

[49] *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004) (citing 42 U.S.C. § 2000cc-2).

[50] *Garner v. Kennedy*, 713 F.3d 237, 241 (5th Cir. 2013) (quoting *Adkins*, 393 F.3d at 570).

[51] *Chance v. Tex. Dep't of Criminal Justice*, 730 F.3d 404, 410 (5th Cir. 2013).

[52] *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)).

[53] *Holt v. Hobbs*, 135 S.Ct. 853, 863 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726-27 (2014)).

because it causes them to forgo group religious practices that they sincerely believe are required by their faith,[54] (2) the State has failed to prove that the policy's application to Muslim prisoners actually advances prison security or any other "compelling governmental interest,"[55] and (3) even if direct supervision does advance a compelling interest, it is not the least restrictive means of doing so.[56]   Brown, the Inmate Intervenors, and several *amici* contend on appeal that the Scott Plan's direct supervision requirement imposes a substantial burden because it limits Muslim inmates to one hour of group religious services per week, which, they assert, is insufficient time to complete weekly Jumu'ah, Taleem, and Qur'anic studies as required by their religious beliefs.  They also assert that permitting indirect supervision of these services does not raise security issues and that TDCJ could provide direct supervision at little additional cost.

TDCJ contends that it is not the direct supervision policy that limits opportunities for Muslim inmates to participate in Taleem and Qur'an Studies but instead, it is a lack of volunteers to supplement the teaching and worship opportunities supervised by TDCJ Muslim chaplains and TDCJ staff. Precedent from this court supports such a conclusion.  TDCJ's policy allows Muslim volunteers to conduct services and studies for and with inmates.  But, as the district court expressly found, "despite specific and concerted efforts over the past years to recruit volunteers to participate in Muslim religious activities at the prison, TDCJ has been unsuccessful in securing a significant number of Muslim religious volunteers."[57]

---

[54] ROA 1975-76.
[55] ROA 1976-77.
[56] ROA 1977.
[57] ROA 1953.

No. 14-20249
c/w No. 14-20444

This court has considered several challenges under RLUIPA to TDCJ's policy that religious worship and study when more than four inmates are involved must be directly supervised by a TDCJ employee or a TDCJ-approved volunteer.[58] In *Adkins v. Kaspar*, the plaintiff was a member of the Yahweh Evangelical Assembly (YEA).[59] Like the Muslim inmates in the present case, he complained that the direct supervision requirement, together with a shortage of outside YEA volunteers, deprived him of adequate opportunities for group religious practice.[60] This court held that the lack of opportunity for group religious practice resulted "not from some rule or regulation that directly prohibits such gatherings" but instead "from a dearth of qualified outside volunteers available to go to [the prison]."[61] We concluded in *Adkins* that the TDCJ's policies had not imposed a substantial burden on the plaintiff.[62]

Subsequently, in *Baranowski v. Hart*, an inmate had protested the recurring failure of one of the TDCJ's prisons to allow for group religious services on Jewish holy days.[63] This court took note of the fact that on each of the days on which religious services were not held, "no rabbi or approved religious volunteer was available to lead the services."[64] As in *Adkins*, the court held that the lack of volunteers, and not the direct supervision requirement, caused the religious gatherings to be infrequent, such that "the acts of Defendants regarding religious services have not placed a substantial

---

[58] *See, e.g.*, *Mayfield v. Tex. Dep't Crim. Justice*, 529 F.3d 599 (5th Cir. 2008); *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007); *Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004).

[59] 393 F.3d at 562.

[60] *Id.* at 562, 571.

[61] *Id.* at 571.

[62] *Id.*

[63] 486 F.3d at 124-25.

[64] *Id.* at 124.

14

No. 14-20249
c/w No. 14-20444

burden on Baranowski's free exercise of his Jewish faith, within the contemplation of RLUIPA."[65]

These decisions did not adopt a per se rule. We said in *Adkins* that "whether the government action or regulation in question imposes a substantial burden on an adherent's religious exercise" "requires a case-by-case, fact-specific inquiry."[66] In *Mayfield v. Texas Department of Criminal Justice*,[67] an Odinist submitted affidavits averring that group worship meetings known as Blotar should be conducted on a monthly basis at a minimum.[68] There was evidence that outside volunteers came only once every 18 months to conduct Blotar, and Odinists inmates were "unable to conduct Blotar on a regular basis because the TDCJ requires that they have a security-trained, religious volunteer present for their group meeting."[69] But there was also evidence in *Mayfield* that the volunteer policy was not imposed uniformly because an exception was made for Muslim inmates in order to comply with the consent decree that is at issue in the case now before us.[70] Pertinent to our analysis in the present case, we said in *Mayfield* that "[b]ecause the volunteer policy was implemented uniformly in the *Adkins* case, it was not the policy imposing the burden on Adkins' religious practice, but instead the lack of qualified volunteers."[71]

---

[65] *Id*. at 125 (citing *Adkins*, 393 F.3d at 571); *see also Odneal v. Pierce*, 324 F. App'x 297, 302 (5th Cir. 2009) (unpublished) (affirming grant of summary judgment because "the infrequency of Native American services at the McConnell Unit is due to a dearth of outside volunteers rather than any regulation directly prohibiting these ceremonies").

[66] 393 F.3d at 571.

[67] 529 F.3d 599 (5th Cir. 2008).

[68] *Id*. at 602.

[69] *Id*.

[70] *Id*. at 608.

[71] *Id*. at 614.

15

No. 14-20249
c/w No. 14-20444

The present case differs materially from *Mayfield* because in the case before us, there is no evidence that "calls into question the uniformity of the policy's application."[72]   The direct supervision requirement under the Scott Plan has been imposed uniformly, as it was in *Adkins*.  Accordingly, applying our precedent as we are bound to do, it is not the Scott Plan that has imposed a burden on Muslim inmates' religious exercise.  It is the lack of volunteers who adhere to the faith of Islam.

## V

The district court also held that the Consent Decree remains necessary to remedy ongoing violations of the Free Exercise Clause.[73]  The  district court recognized that "the Fifth Circuit Court of Appeals has upheld TDCJ's volunteer policy," citing *Baranowski*, *Adkins*, and an unpublished opinion,[74] but concluded that we had done so "on a record very different from the ones in the present case."[75]  We disagree with the district court's conclusions in that regard.

The district court did not discuss or cite the Supreme Court's decision in *O'Lone v. Estate of Shabazz*,[76] in which Muslim inmates brought challenges based on the Free Exercise clause to "policies adopted by prison officials which resulted in their inability to attend Jumu'ah, a weekly Muslim congregational service regularly held in the main building" of the prison on Fridays.[77]  The prison officials in *O'Lone* refused to exempt Muslim inmates from working

---

[72] *Id.*

[73] *Brown v. Livingston*, 17 F. Supp. 3d 616, 632-33 (S.D. Tex. 2014).

[74] *Id.* (citing *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007); *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004); and *Odneal v. Pierce*, 324 Fed. App'x 297 (5th Cir. 2009)).

[75] *Id.*

[76] 482 U.S. 342 (1987).

[77] *Id.* at 345.

No. 14-20249
c/w No. 14-20444

outside the main building on Friday afternoons, and therefore, they were unable to attend Jumu'ah.  The Supreme Court held that this "did not violate respondents' rights under the Free Exercise Clause of the First Amendment."[78] The Supreme Court applied the standard of review set forth in *Turner v. Safley*,[79] ultimately concluding that "[w]e take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to 'substitute our judgment on . . . difficult and sensitive matters of institutional administration . . . for the determinations of those charged with the formidable task of running a prison.'"[80]

Under *Turner*, we consider:

(1) whether a "valid, rational connection exists between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether there exist "alternative means of exercising the fundamental right that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there is an "absence of ready alternatives" to the regulation in question.[81]

Applying these factors to the case presently before us, we cannot agree with the district court that the TDCJ's direct supervision requirement fails *Turner*'s rationality review and violates the Free Exercise clause.

## A

The Supreme Court explained in *Turner* that in analyzing whether there is a "'valid, rational connection' between the prison regulation and the

---

[78] *Id.*

[79] 482 U.S. 78 (1987).

[80] *O'Lone*, 482 U.S. at 353.

[81] *Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (alteration omitted) (quoting *Turner*, 482 U.S. at 89-90).

17

legitimate governmental interest put forward to justify it, . . . the governmental objective must be a legitimate and neutral one."[82]   The Court continued, "[w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression."[83]  The Scott Plan is uniform. It applies to all religions, without regard to the what beliefs or principles are held or espoused.[84]

The TDCJ contends that the legitimate government interest at stake in imposing the direct supervision requirement is ensuring prison security, especially in light of the TDCJ's limited resources.  It asserts that direct supervision, including that undertaken by volunteers, deters wrongful behavior, and that the direct supervision provided by volunteers differs from that provided by inmates.  Volunteers are more likely to report violations than inmates.   These common-sense justifications are sufficient to establish a rational connection between direct supervision and prison security.[85]  "[I]t cannot seriously be maintained that 'the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.'"[86]

These justifications are also amply supported by the record, notwithstanding the district court's conclusion that direct supervision of

---

[82] *Turner*, 482 U.S. at 89-90.

[83] *Id.* at 90.

[84] *See Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 608 (5th Cir. 2008) ("In prior cases where we have affirmed summary judgment on similar § 1983 claims, we have relied on the neutrality of the prison's policy in doing so.").

[85] *Cf. Jones v. Brown*, 461 F.3d 353, 361 (3d Cir. 2006) ("[W]here the connection is obvious, common sense may suffice[.]").

[86] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89-90 (1987)).

*Muslim* services is not necessary to promote safety. The district court's focus solely on *Muslim* services was in error. The question is whether the TDCJ's policy, which applies to *all* inmates, not just Muslim inmates, is rationally connected to prison security and safety. There is unrefuted evidence that security issues arise during *directly* supervised worship. It stands to reason that opportunities for disruption or violence would increase if worship services were only indirectly supervised. Though the district court refused to permit TDCJ to offer evidence that fights or assaults at services other than Muslim services had occurred,[87] the record nevertheless establishes that direct supervision of inmate religious gatherings of more than four individuals furthers legitimate government interests. The district court's findings and conclusions to the contrary are not supported by the record or common sense.

It is undisputed that when the consent decree regarding Muslim inmates was in effect, "[a]ll the other faith groups were [directly] supervised," which meant a chaplain, volunteer or a correctional officer was in the room with the inmates, "not just someone roving, walking by, checking on them frequently."[88] When the consent decree was in effect, TDCJ required direct supervision of the more than 132,000 non-Muslim inmates. Presently, under the Scott Plan, TDCJ requires direct supervision of all inmates when worshiping because otherwise, as a TDCJ employee testified, "we'd have large amounts of offenders meeting without direct supervision, and anything can happen in a prison," such as "escape attempts," "staff assaults," and "inmate assaults."[89] The evidence is undisputed that offenders with histories of serious criminal conduct attend worship services. "Some of these offenders are G4 offenders that have

---

[87] ROA 2699.
[88] ROA 4079-80.
[89] ROA 4081.

escape histories, they have assault histories, they're confirmed gang members even though they're out in the offender population, they have a history of staff assaults, inmate assaults. You've got all these offenders coming into one area of the facility to congregate, and anytime you have a large group of offenders and even sometimes a small group of offenders, that's areas that we need to directly supervise for public safety, for the safety of staff and the safety of the inmate population."[90]

There was testimony that having personnel "in there to respond to that when something's happening during a service,"[91] rather than camera surveillance, is necessary because a person in the room is "getting the tone of the service or the cell block and watching the offenders, if they're grouping up or, you know, just how the offenders are acting that particular day," and "[y]ou're not going to get that through a video surveillance system."[92]

An expert witness who was formerly a warden in Florida testified that altercations occurred during religious services in the units he supervised, some of which involved "a serious incident of bodily harm."[93] This witness also testified that if inmates are leading a service, security is needed, and having a person in the room observing them is the "best form" of security.[94] He also confirmed that "some offenders have custody levels that make them dangerous"; when they are present in religious services, it is important to have security; and that the "best way" of supervision in those cases is direct supervision.[95] But more broadly, he testified that in light of his experience, a

---

[90] ROA 4078.
[91] ROA 4081.
[92] ROA 4042.
[93] ROA 2821.
[94] ROA 2894.
[95] ROA 2894-95.

No. 14-20249
c/w No. 14-20444

security presence in the form of a volunteer or a chaplain observing and directly supervising the inmates in the service "needs to be there in a religious service to prevent inmates from conducting any disruptive or criminal activity in a service."[96]

A TDCJ Muslim inmate who testified at the hearing confirmed that he has seen "fights break out" at "church services" other than Muslim services, and that the prison in which he was incarcerated was "locked down" as a result of "fights [that] have taken place in church services."[97]

There was also unrefuted testimony from TDCJ that "we have a Prison Rape Elimination Act that we have to come into compliance with. There are almost 50 standards that we're trying to come into compliance with, and the only way we can come in compliance with that is to make sure that we have appropriate supervision of our offender population."[98] Relatedly, the National Prison Rape Elimination Commission Report 6 (June 2009) recommends direct supervision of inmates should be used "wherever possible" "because it is the most effective mode of supervision for preventing sexual abuse and other types of violence and disorder."[99] That Commission made the following finding and recommendation:

> Supervision is the core practice of any correctional agency, and it must be carried out in ways that protect individuals from sexual abuse. The Commission believes it is possible to meet this standard in any facility, regardless of design, through appropriate deployment of staff. Direct supervision, which features interaction between staff and prisoners, should be used wherever possible

---

[96] ROA 2903.

[97] ROA 2697-98.

[98] ROA 4078.

[99] Nat'l Prison Rape Elimination Commission Report, 6 (2009), available at https://www.ncjrs.gov/pdffiles1/226680.pdf.

21

No. 14-20249
c/w No. 14-20444

because it is the most effective mode of supervision for preventing sexual abuse and other types of violence and disorder.[100]

The district court's own findings reflect that if TDCJ were to permit adherents of each faith to gather in groups of more than four with only indirect supervision, security risks would exist. The district court recognized "there is evidence that the more serious incidents that occurred at or near religious activities occurred during Catholic and Protestant services even though a Chaplain, prison guard, or outside volunteer was present."[101] Yet, the district court concluded that this was not evidence of a need for direct supervision of inmates during religious activities.

The district court's conclusion in this regard appears to be based upon a "Finding of Fact" that the "practice of permitting inmate-led services, as described in the Consent Decree, was the 'usual' practice in prison systems."[102] The district court cited the testimony of three witnesses in support of this conclusion, but read in context, each witness said that in the wake of the Consent Decree in the present case, prisons in some other jurisdictions had adopted the provisions of the Consent Decree for *Muslim* inmates, not for inmates of other faiths.

The district court's opinion states:

> McAndrew testified that prisons use methods other than direct supervision to ensure security at religious meetings, such as roving patrols and visual observations through windows. He also testified that, in his experience, the practice of permitting inmate-led services, as described in the Consent Decree, was the "usual" practice in prison systems.[103]

---

[100] *Id.*

[101] *Brown v. Livingston*, 17 F. Supp. 3d 616, 628 (S.D. Tex. 2014).

[102] *Id.*

[103] *Id.*

22

No. 14-20249
c/w No. 14-20444

This is incorrect. McAndrew testified that after the consent decree in the present case was entered, an unspecified number of prisons used the consent decree as a model for a policy regarding *Muslim* inmates and have allowed indirectly supervised, inmate-led religious meetings by Muslim inmates.[104] McAndrew did not testify that indirect supervision is a "usual" practice with regard to any other faith group.

The district court also relied upon the testimony of a former Chaplain in New York, Ibrahim Ezghair. Ezghair recounted that a state prison system less than half the size of the Texas system had adopted and implemented the terms of the consent decree at issue in the present case and had "experienced no security or safety threats or events involving inmate-led or indirectly supervised Muslim religious activities."[105] The district court characterized another Muslim Chaplain's testimony, that of Chaplain Shabazz, as saying that "many prison systems throughout the United States" permit indirect supervision of inmate-led religious activities by Muslims, and that the witness was "unaware of any safety concerns."[106] This evidence is not only conclusory and lacking in specificity, it is myopically focused on Muslim services. It is not evidence that indirect supervision of religious services in prisons as a general proposition presents no safety concerns. None of these witnesses testified that prisons have permitted or reasonably should permit virtually all worship or religious activities by inmates to occur with only indirect supervision.

In a letter to this court, the plaintiffs assert that "the Consent Decree regime is the model followed by penal institutes throughout the nation." The plaintiffs do not provide any specificity in this regard. They cite to one page in

---

[104] ROA 2792-93.

[105] *Brown*, 17 F. Supp. 3d at 627.

[106] *Id.*

23

the district court's opinion in this case,[107] which in turn relied on conclusory testimony, just discussed above, from two witnesses regarding indirect supervision of *Muslim* religious gatherings adopted by some prison systems in the wake of the consent decree that is presently at issue.[108]  None of that testimony averred that indirect supervision of religious gatherings for inmates has been widely accepted or even that indirect supervision of *Muslin inmates*, admittedly modeled after the consent decree in the present case, has been widely accepted.

The plaintiffs' letter to this court also cites an amicus brief by four individuals who denominate themselves "Former Prison Wardens."  That brief relates those individuals' own experiences, which amounts to unsworn testimony that is not part of the record in this case and is not subject to cross-examination.  In support of the assertion that "monitoring through indirect supervision is a common method of ensuring security for inmate-led worship," the amicus brief cites regulations in four jurisdictions.[109]  The existence of such policies in four states does not establish that the Federal Government, the vast majority of States, or even a bare majority of the States, have such a policy.

We also know from court decisions around the country that at least seventeen other jurisdictions do not permit inmates to gather for religious exercise without direct supervision.[110]  "'While not necessarily controlling, the

---

[107] *Brown*, 17 F. Supp. 3d at 627.

[108] *See Brown*, 17 F. Supp. 3d at 627.

[109] Cal. Code Regs., tit. 15, § 3211(a); 03-201 Me. Code R. Ch. 10, Subs. 24.3, § VI; Kan. Admin. Regs. 44-7-113; N.Y. Comp. Codes R. & Regs. tit. 9, § 7024.2.

[110] *See, e.g., Hall v. Sutton*, 581 F. App'x 580, 581 (7th Cir. 2014) (Illinois); *Turner v. Hamblin*, 590 F. App'x 616, 619-20(7th Cir. 2014) (Wisconsin); *Bader v. Wrenn*, 675 F.3d 95, 96 (1st Cir. 2012) (New Hampshire); *Hathcock v. Cohen*, 287 F. App'x 793, 800-01 (11th Cir. 2008) (per curiam) (Florida); *McElhaney v. Elo*, 202 F.3d 269, 2000 WL 32036, at *4 (6th Cir. Jan. 6, 2000) (Michigan); *Manges v. Harman*, No. 3:11-CV-369 PPS, 2014 WL 5488457, at *10 (N.D. Ind. Oct. 29, 2014); *Guess v. McGill*, No. 9:13-cv-02260-TLW, 2014 WL 5106735, at

policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction.'"[111]

The amicus brief additionally asserts that an expert witness at the hearing, Ron McAndrew, "testified that allowing indirectly supervised, inmate-led services was a 'usual' practice in other prison systems." This is misleading. McAndrew testified that after the consent decree in the present case was entered, an unspecified number of prisons used the consent decree as a model for a policy regarding *Muslim* inmates and have allowed indirectly supervised, inmate-led religious meetings by Muslim inmates.[112] McAndrew did not testify that this is a "usual" practice with regard to any other faith group.

The amicus brief also quotes snippets of testimony from another expert witness at the hearing, Alexander Taylor, asserting that he "testified that 'the most common practice . . . is where the chaplain in the building is able to do that roving type of observation, sitting in as needed . . . .'" But read in its entirety, that was not the import of Taylor's testimony. He said a chaplain roving during services "sit[s] in as needed, and sometimes through entire services."[113] But more importantly, he testified that though such a roving

---

*10-11 (D. S.C. Oct. 10, 2014); *Leishman v. Patterson*, No. 2:11-CV-00309 CW, 2014 WL 2117543, at *6-7 (D. Utah May 21, 2014); *Vega v. Lantz*, No. 3:04CV1215(DFM), 2013 WL 6191855, at *5, *8 (D. Conn. Nov. 26, 2013); *Ericson v. Magnusson*, No. 2:12-cv-00178-JAW, 2013 WL 2634761, at *4 (D. Me. June 12, 2013); *Howard v. Wiglesworth*, No. 5:10cv163-RHW, 2012 WL 3867011, at *5 (S.D. Miss. Sept. 5, 2012); *Countryman v. Palmer*, No. 3:11-cv-00852-ECR-VPC, 2012 WL 4340659, at *5 (D. Nev. Aug. 7, 2012); *De'Lonta v. Johnson*, No. 7:11-cv-00175, 2012 WL 2921762, at *2 (W.D. Va. Jul. 17, 2012); *Montague v. Corr. Corp. of Am.*, No. 3:10-cv-0443, 2011 WL 3476543, at *3 (M.D. Tenn. Aug. 8, 2011); *Jihad v. Fabian*, No. 09-1604 (SRN/LIB), 2011 WL 1641885, at *19 (D. Minn. Feb. 17, 2011); *Strutton v. Meade*, No. 4:05CV02022 ERW, 2010 WL 1253715, at *47 (E.D. Mo. Mar. 31, 2010); *Morrison v. Cook*, No. 97-57-ST, 1999 WL 717218, at *4-5 (D. Or. Apr. 27, 1999).

[111] *Holt v. Hobbs*, 135 S.Ct. 853, 866 (2015) (quoting *Procunier v. Martinez*, 416 U.S. 396, 414, n.14 (1974)).

[112] ROA 2792-93.

[113] ROA 2891.

No. 14-20249
c/w No. 14-20444

practice is employed, "oftentimes" it is "not" the most common practice.[114]  He then explained that "[q]uite frequently" there is "direct supervision, having someone physically in the room."[115]  He testified that, in lower security institutions, "constant supervision isn't quite as well practiced."[116]  "[D]irect supervision, having someone physically in the room, is utilized in religious services . . . quite frequently."[117]  "[S]pecific circumstances" when direct supervision is used depends on the custody level of the institution, but even in lower security units, when there are large numbers of inmates, a security officer would be present:

> [E]very institution has a profile for the type of custody levels that they embrace.  And the higher the custody level, the more difficult the prison population is, the more likely you will have constant supervision.
>
> With the less, lower security level institutions, then the constant supervision isn't quite as well practiced.  In there, you would have somebody, you know – a chaplain would be there, and the service may take part while the chaplain is moving from room to room. But another reason for the provision of a security officer is simply the numbers. When there are large numbers of inmates, we want to have appropriate supervision.[118]

Taylor made clear that when he was a chaplain in a Florida prison, there was indirect supervision in an inmate-led service only "[w]hen there are smaller services and there is [sic] only a few inmates."[119]  At the time of the hearing, there were 6,775 Muslim inmates[120] in 96 prisons across Texas.[121]

---

[114] ROA 2891.
[115] ROA 2891.
[116] ROA 2892.
[117] ROA 2891.
[118] ROA 2891-92.
[119] ROA 2906.
[120] *Brown v. Livingston*, 17 F. Supp. 3d 616, 622 (S.D. Tex. 2014).
[121] *Id.* at 623.

No. 14-20249
c/w No. 14-20444

Averaging the number of inmates across 96 prisons would mean that 70 Muslim inmates in each prison would potentially attend services and other religious activities. We know from some of the findings of the district court that in at least one prison, in Childress County, there were 53 Muslim inmates.[122] But if only 53 inmates in each prison desired to attend group worship or study, that is a significant number.

Taylor also testified that, based on his experience in Texas and Florida, when "inmates are leading a service . . . having someone there in person observing them" would be "the best form" of security.[123] He also confirmed that in services in which "some offenders who have a custody levels that make them dangerous" are present, the "best way" of supervising is "direct supervision."[124] He summarized and reiterated his opinion that direct supervision "needs to be there in a religious service to prevent inmates from conducting any disruptive or criminal activity in a service."[125]

The district court's "Findings of Fact" state that "[d]uring the thirty-five years the Consent Decree was in effect and being adhered to by TDCJ, there has been no evidence of a single reported or known incident involving a serious security risk to the prison, its staff, inmates or the public at large involving inmate-led Muslim religious activity."[126] The district court then reasoned that "[i]n other words, adherence to Sections III(8) and III(15) of the Consent Decree," which exempts only Muslim inmates from direct supervision, "has not

---

[122] *Id.* at 624.
[123] ROA 2894.
[124] ROA 2894-2895.
[125] ROA 2903.
[126] *Brown*, 17 F. Supp. 3d at 621.

27

presented or posed a threat to the security or safety of the institution or the public."[127]

The implicit assumption underlying this ruling, and the plaintiffs' arguments, is that Muslim inmates have been relatively peaceful in the past when indirectly supervised, and therefore, all present and future Muslim inmates, unlike inmates of other faiths, pose no threat to security, safety or order within the TDCJ system of 111 prisons.  Muslim inmates therefore must be permitted to conduct inmate-led religious gatherings without direct supervision.  This rationale is problematic for at least two reasons: (1) it ignores evidence that there is a need for direct supervision of Muslim inmates, and (2) it gives disparate, preferential treatment to Muslim inmates over inmates of other faiths.

Courts have recognized that permitting inmates to lead worship services without appropriate supervision can create hierarchies that are detrimental to a prison's discipline structure.  The Seventh Circuit, for example, has observed that "allow[ing] inmates to conduct their own religious services [is] a practice that might not only foment conspiracies but also create (though more likely merely recognize) a leadership hierarchy among the prisoners."[128]  Relatedly, the Supreme Court credited testimony in *O'Lone v. Estate of Shabazz* that allowing "'affinity groups' in [a] prison to flourish" leads to "'a leadership role and an organizational structure that will almost invariably challenge the institutional authority'" and that "special arrangements for one group would create problems as 'other inmates [see] that a certain segment is escaping'" a prison requirement applicable to all others.[129]  The "affinity group" in *O'Lone*

---

[127] *Id.*

[128] *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988).

[129] 482 U.S. 342, 353 (1987).

was comprised of Muslim inmates seeking exemption from work details on Friday afternoons in order to attend Jumu'ah services.[130]

In the case before us, there was evidence of hierarchies among Muslim inmates in the TDCJ system. TDCJ Muslims inmates testified "[we would] police ourselves"[131] when problems arose during inmate-led services that were only indirectly supervised. Inmate worship leaders would prohibit an inmate who behaved inappropriately from attending services for a period of time[132] and did not report incidents to prison officials because "we take care of ourselves."[133] Accordingly, for those who attended indirectly supervised religious gatherings, whether a Muslim inmate would be permitted religious exercise was left to the sole discretion of another inmate, and TDCJ officials were kept unaware of disciplinary issues. It is detrimental to the rights of inmates when they are disciplined by other inmates, and such a system undermines the prison's disciplinary and oversight functions.

The district court did not discuss this evidence. Nor did the district court discuss unrefuted evidence that violence occurred during a Muslim worship service even though that service was directly supervised by a TDCJ employee who was able to intervene immediately.[134] In another incident, an intense argument among Muslim inmates at a religious gathering resulted in a response team from the prison being called due to the potential for violence and harm to those present at the worship service, though no physical injury

---

[130] *Id.*

[131] ROA 2697.

[132] ROA 2697.

[133] ROA 3818.

[134] Def. Ex. 46 (incident occurred on July 31, 2013); *see also* ROA 3077 (the Scott Plan went into effect in January 2013).

Case: 14-20249    Document: 00515020007    Page: 30    Date Filed: 07/02/2019

No. 14-20249
c/w No. 14-20444

occurred before the response team arrived to quell the disorder.[135]  There was also evidence of other disruptions in Muslim religious gatherings that did not result in physical violence but were disruptions, nevertheless.

The district court reasoned that volunteers are not security personnel and "the presence of an outside volunteer [does not] further [TDCJ's] compelling state interest in prison security."[136]  The record as a whole does not support this conclusion.

There was unrefuted testimony that prisons across the country utilize volunteers to supervise religious exercise by inmates because volunteers do have a positive impact on maintaining security, safety, and orderliness.[137]  An expert witness testified that, in his opinion, a volunteer or a chaplain "needs to be there in a religious service to prevent inmates from conducting any disruptive or criminal activity."[138]  This witness also testified that "volunteers do conduct some of the similar duties like a correctional officer who watches offenders . . . they watch offenders."[139]  Though volunteers do not have to power to discipline or search inmates or physically restrain them, an expert witness testified that he would be satisfied with volunteer-provided security through direct supervision because they can inform staff if something were to happen within the service "that shouldn't be happening" and because when a

---

[135] ROA 3816-17; *Lemons v. Tex. Dep't of Criminal Justice*, No. 2:09-cv-0102, 2012 WL 2133700 at \*6 (N.D. Tex. May 17, 2012).

[136] *Brown v. Livingston*, 17 F. Supp. 3d 616, 627 (S.D. Tex. 2014).

[137] ROA 4191 (volunteers can directly supervise to gauge whether offenders are "having inappropriate conversations or they're having a gang meeting or they're passing notes, passing contraband, looking for those warning signs"); 4195 (volunteers are trained "about security issues and what to be mindful of and what to look for"); s*ee also Chance v. Tex. Dep't of Criminal Justice*, 730 F.3d 404, 414-15 & nn.7-8 (5th Cir. 2013) (agreeing that volunteer supervision serves an important government interest in prison safety and security); *McAlister v. Livingston*, 348 F. Appx 923, 937 (5th Cir. 2009) (per curiam) (same).

[138] ROA 2903.

[139] ROA 2923.

volunteer is present, "the offenders would be more likely to stay with the topic and with what should be said instead of going off on tangents or discussing things that maybe were not religious in nature."[140]  There was other expert testimony that a volunteer or chaplain can provide observations during religious gatherings of inmates as well as a corrections officer can provide observations.[141]

TDCJ conducts background checks of volunteers and provides training regarding security issues, what to be mindful of and look for when in an inmate population and in services, what to do if a fight or riot erupts.[142]  TDCJ volunteers are trained to report any security breaches to prison officials.[143] Muslim inmates attending indirectly supervised religious activities have not always reported misbehavior or security breaches because of "the offender code and telling on each other and as to labeling each other as a snitch."[144]

The district court's conclusion that "[t]here is no evidence that the presence of a volunteer during a Muslim religious activity at TDCJ increases prison safety or security in any way"[145] failed to consider that the evidence on this point is limited.  The TDCJ inmates who testified regarding Muslim religious exercise said that, due to the paucity of Muslim volunteers, no volunteers were in any of the services or religious activities that they attended.[146]  The evidence was extremely sparse, if not non-existent, as to the impact volunteers might have had if they had been available to supervise

---

[140] ROA 3499-500.

[141] ROA 4042.

[142] ROA 4195.

[143] ROA 4036-37.

[144] ROA 3716.

[145] *Brown v. Livingston*, 17 F. Supp. 3d 616, 636 (S.D. Tex. 2014).

[146] *See, e.g.,* ROA 3262 ("Since my 17 years of being on the Robertson Unit, we have never had a volunteer that showed up."); 2627; 2691-92.

No. 14-20249
c/w No. 14-20444

Muslim inmates' religious exercise. As already discussed, because the Muslim inmates "take care of their own," we do not know what issues arose that could have been obviated by the presence of volunteers.

There is a rational connection between the TDCJ's indirect supervision requirement and the governmental interest in providing security in prisons.

**B**

As to *Turner*'s second consideration—Muslim inmates' "alternative means of exercising" their religion beliefs[147]—"[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith."[148] In *Adkins* we upheld the direct supervision requirement against a Free Exercise challenge because the record reflected that "(1) Adkins had access to religious materials; (2) he and other YEA inmates were not required to work on the Sabbath; (3) video and audio tapes were made available on Mondays to all YEA members; and (4) YEA members were permitted to hold and attend live services" when a volunteer was available, approximately monthly.[149] Here, the record demonstrates, and none of the plaintiffs contest, that Muslim TDCJ inmates are permitted to attend a weekly Jumu'ah service,[150] significant accommodations are made for religious festivals such as Ramadan,[151] and Muslim inmates are permitted to keep religious objects,

---

[147] *Turner v. Safley*, 482 U.S. 78, 90 (1987).

[148] *Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (alteration in original) (quoting *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 861 (5th Cir. 2004)); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52 (1987) (holding, where Muslim inmates "retain[ed] the ability to participate in other Muslim religious ceremonies," that inability to attend weekly Jumu'ah service did not violate Free Exercise Clause).

[149] *Adkins*, 393 F.3d at 564.

[150] ROA 3284, 3353.

[151] ROA 2704-07, 3626-27.

No. 14-20249
c/w No. 14-20444

including a Qur'an, a prayer rug, and prayer beads, in their cells for personal prayer and study.[152]  Muslims inmates may gather in groups of four or fewer to worship and study.   All Muslim inmates have access to a diet that conforms to their faith's restrictions.   While Muslim inmates may not be permitted to engage in as many religious gatherings with the numbers of inmates as they wish, we conclude, as in *Adkins*, that they have alternative means of exercising their religious rights.

## C

The third *Turner* consideration addresses the impact the accommodation sought would have on other inmates and prison staff and on the allocation of prison resources, generally.  We conclude, as we did in *Adkins*, that continuing to allow Muslim inmates the freedom to congregate without direct supervision "could 'spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates and prison resources.'"[153]   Furthermore, "if [Muslim inmates] were accommodated and other similarly situated small religious groups were not, [Islam] could appear to be favored over the others, a perception that could have a negative effect on prison morale and discipline."[154]

The evidence was unrefuted that TDCJ is short-staffed in spite of sustained efforts to hire security personnel.[155]  The TDCJ offered evidence that the situation was "critical."  At the time of the hearing, the TDCJ was "3,000 officers short," and "spending 5 million plus in overtime a month."[156]  In some of the TDCJ's "units in West and South Texas," it was "critically short," and "a

---

[152] ROA 2651, 2695.
[153] *Adkins*, 393 F.3d at 565 (quoting *Freeman*, 369 F.3d at 862).
[154] *Id.*
[155] ROA 4072-73.
[156] ROA 4072.

very serious situation."[157]  "[W]e're doing all we can, as [others testified], about trying to recruit new staff," and "[w]e're doing all we can to try to retain the staff that we have on our facilities."[158]  Priority is given to positions such as "a dorm housing rover or a cell block rover, an inside picket officer, . . . central control officer, our outside guard towers, things like that, those things that are crucial to the safety and security of the institution."[159]  The TDCJ offered evidence that it does not have staff to provide more than one hour of directly supervised religious activities to all inmates seeking to engage in religious activities beyond the one-hour weekly services that are directly supervised by TDCJ employees or even solely to Muslim inmates.

The district court's response to this evidence was that the TDCJ should cease training and organizing volunteers for religious gatherings in prisons. But the costs that would be saved were not quantified, and there was no evidence that requiring TDCJ to cease and desist from permitting volunteers in the prisons would free sufficient time for TDCJ employees to provide an additional hour of direct supervision of Muslim religious activities each week, much less the additional hours that the district court would require. Requiring TDCJ to cease allowing volunteers would also be contrary to the district court's finding and unrefuted evidence that volunteers have a substantial, positive impact on inmates and lessen the potential for violence in the prisons.

## D

The fourth consideration under *Turner*'s standard of review is whether there is an absence of ready alternatives to the TDCJ's direct supervision

---

[157] ROA 4073.
[158] ROA 4073.
[159] ROA 4073.

No. 14-20249
c/w No. 14-20444

requirement.  We have examined alternatives above and do not repeat that discussion here.

In sum, we conclude that the Scott Plan poses no violation of the Free Exercise Clause that would render the consent decree, and its allowance of indirect supervision of Muslim religious gatherings, "necessary to correct a current and ongoing violation of the Federal right."[160]

## VI

The district court concluded that the TDCJ's regulations and policies favored Catholic, Jewish, Native American and Protestant inmates over Muslim inmates.[161]  Citing the Supreme Court's decision in *Larson v. Valente*, which involved a state statute imposing registration and reporting requirements on religious organizations that solicited more than fifty percent of their funds from nonmembers,[162] the district court concluded that "when it is claimed that a prison regulation violates an inmate's Establishment Clause rights it must be subjected to strict scrutiny analysis and is upheld only if it is 'closely fitted' to further a 'compelling government interest.'"[163]  The TDCJ contends that the more deferential standard articulated in *Turner v. Safley*[164] applies.   I first consider the appropriate standard for analyzing the inmates' Establishment Clause claims.

## A

The Supreme Court has not directly addressed the standard of review that applies when inmates assert a violation of the Establishment Clause, and more particularly, whether the applicable standard may depend upon the

---

[160] 18 U.S.C. § 3626(b)(3).

[161] *Brown v. Livingston*, 17 F. Supp. 3d 616, 630-33 (S.D. Tex. 2014).

[162] 456 U.S. 228, 230 (1982).

[163] *Brown*, 17 F. Supp. 3d at 632 (quoting *Larson*, 456 U.S. at 247).

[164] 482 U.S. 78 (1987).

specifics of the claim. The Supreme Court has recognized, however, that the "constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause."[165]

As discussed in Section V above, *O'Lone v. Estate of Shabazz* analyzed Free Exercise claims and "consider[ed] once again the standard of review for prison regulations claimed to inhibit the exercise of constitutional rights."[166] In *O'Lone*, prison regulations precluded Muslim inmates assigned to outside work details from attending Jumu'ah.[167] The Third Circuit had held that the prison's "policies could be sustained only if: 'the state . . . show[s] that the challenged regulations were intended to serve, and do serve, the important penological goal of security, and that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona fide security problems.'"[168] The Supreme Court rejected this standard of review. "We think the Court of Appeals['] decision in this case was wrong when it established a separate burden on prison officials to prove 'that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona fide security problems.'"[169]

The Court explained at length in *O'Lone* why the "reasonableness test" set forth in *Turner v. Safley*, rather than strict scrutiny, applied.[170] The *O'Lone* decision then admonished, "[t]o ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness'

---

[165] *Larson*, 456 U.S. at 245.

[166] 482 U.S. 342, 344 (1987).

[167] *Id*. at 347.

[168] *Id*. at 347 (quoting *Shabazz v. O'Lone*, 782 F.2d 416, 420 (3d Cir. 1986)).

[169] *Id*. at 350 (quoting *Shabazz*, 782 F.3d at 420)).

[170] *Id*. at 348-350 (quoting *Turner v. Safley*, 482 U.S. 78, 86-87 (1987)).

test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."[171]    Referring to *Turner*, the Court said, "[w]e recently restated the proper standard:  '[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'"[172]    The Court continued, "[t]his approach ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,' and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to 'resolution by decree.'"[173]    The regulations at issue in *Turner* included restrictions on the rights of inmates to marry.

However, *Turner*'s "reasonableness" standard of review does not apply to *all* claims that prison policies are unconstitutional.  The Supreme Court held in *Johnson v. California* that "strict scrutiny is the proper standard of review"[174] for "an equal protection challenge" to a state prison's "policy of racially segregating prisoners in double cells in reception centers for up to 60 days each time they enter a new correctional facility."[175]  The Court observed that "[w]e have never applied *Turner* to racial classifications," and "[w]e think this unsurprising, as we have applied *Turner*'s reasonable-relationship test *only* to rights that are 'inconsistent with proper incarceration.'"[176]    The

---

[171] *Id*. at 349 (citation omitted).

[172] *Id.* (quoting *Turner*, 482 U.S. at 89).

[173] *Id.* (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)); *see also Shaw v. Murphy*, 532 U.S. 223, 228-232 (2001) (analyzing whether inmates possess a First Amendment right to provide legal assistance to other inmates that enhances the protections otherwise available under *Turner* and explaining why they do not).

[174] 543 U.S. 499, 515 (2005).

[175] *Id*. at 502.

[176] *Id*. at 510 (citations omitted).

No. 14-20249
c/w No. 14-20444

Supreme Court held in *Johnson* that "[t]he right not be discriminated against based on one's race is not susceptible to the logic of *Turner*. It is not a right that need necessarily be compromised for the sake of proper prison administration."[177]

At least two Circuit Courts of Appeals have applied a standard to certain categories of Establishment Clause claims that differs from *Turner*'s standard of review.[178] In those cases, prison officials allegedly coerced inmates to participate in a program founded on religious tenets. No one contends that the standard applied in those cases is appropriately applied to the facts of the present case.

The question before us is whether an inmate's claim that prison policies afford some faiths more favorable treatment than others implicates "a right that need [not] necessarily be compromised for the sake of proper prison administration,"[179] to which strict scrutiny would apply, or whether such an Establishment Clause claim is instead grounded in "certain privileges and rights [that] must necessarily be limited in the prison context,"[180] to which *Turner*'s more deferential standard would apply. I conclude that *Turner*'s standard applies.

The Supreme Court has explained that prison officials are not required to provide "identical facilities or personnel" to "every religious sect or group within a prison."[181] "A special chapel or place of worship need not be provided

---

[177] *Id.*

[178] *See, e.g., Jackson v. Nixon*, 747 F.3d 537, 541-542 (8th Cir. 2014) (inquiring "'first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious or secular'") (quoting *Kerr v. Farrey*, 95 F.3d 472, 479 (7th Cir. 1996)).

[179] *Johnson*, 543 U.S. at 510.

[180] *Id.* (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)).

[181] *Cruz v. Beto*, 405 U.S. 319, 325 n.2 (1972).

No. 14-20249
c/w No. 14-20444

for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand."[182]  Nevertheless, "reasonable op[p]ortunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty."[183]

Prison officials, therefore, are *required* to facilitate opportunities for prisoners to worship or otherwise exercise religious beliefs even though, outside the prison context, such involvement would undoubtedly implicate Establishment Clause concerns.  When policies ostensibly designed to honor the Free Exercise rights of inmates are challenged on the basis that they violate the Establishment Clause because the policies favor one or more faith groups over another, logic demands that *Turner*'s standard applies.  In attempting to accommodate the religious beliefs of varying faith groups in compliance with the Free Exercise Clause, prison officials must operate within a zone of "reasonableness."  If policies meet *Turner*'s reasonableness standard in effectuating the Free Exercise rights of inmates, then those policies should not be pruned or eliminated as a result of higher scrutiny under the Establishment Clause, even if those policies do not treat all faith groups precisely the same.  Prison officials have been accorded some flexibility in providing Free Exercise opportunities for inmates.  Inmates' opportunities for religious exercise would be diminished if a more restrictive standard were applied to Establishment Clause claims than is applied to Free Exercise claims, when the allegation is that preference has been given to inmates of one or more faiths.  If prison policies are in fact balanced and meet the *Turner*

[182] *Id.*
[183] *Id.*

No. 14-20249
c/w No. 14-20444

standard, those policies are vindicating only what the First Amendment requires, and such policies do not amount to government involvement in religious matters to such an extent that the Establishment Clause is violated.

The district court concluded that the TDCJ violated the Establishment Clause in three ways.

**B**

The district court observed that there "is an ample supply of clerics and laymen who will volunteer to conduct meetings" for some faith groups, "but that among Muslims it has been hard to find a consistent supply of such volunteers."[184]  The district court concluded that, "[i]n such circumstances, a policy that makes the availability of religious activities dependent upon the availability of outside volunteers necessarily makes it easier for one group to practice its religion over other groups."[185]  Relatedly, the district court concluded that "TDCJ openly favors the Protestantism [sic] and disfavors Islam by devoting state resources to the former disproportionately."[186]  The district court reasoned that "TDCJ has chosen to allocate substantially more resources to religious groups who can procure outside volunteers than for those who are unable to recruit sufficient numbers of outside volunteers to comply with AD 7.30."[187]  The record is clear, however, that the disparity as to resources expended is a function of the number of volunteers, not their religious affiliations.

There is a "valid, rational connection" between permitting volunteers to provide additional opportunities for the exercise of religious rights and "the

---

[184] *Brown v. Livingston*, 17 F. Supp. 3d 616, 631 (S.D. Tex. 2014).
[185] *Id.*
[186] *Id.*
[187] *Id.*

40

legitimate governmental interest"[188] of prison officials in complying with their obligation to afford "reasonable op[p]ortunities . . . to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s]."[189]  "[T]he governmental objective" in permitting volunteers into the TDCJ prisons to provide or assist with religious services and studies is "a legitimate and neutral one" that "operate[s] in a neutral fashion, without regard to the content of the expression."[190]  The record is replete with evidence that inmates who participate in religious services and studies are less likely to have disciplinary issues while confined and have lower recidivism rates once released.  The fact that more volunteers in the TDCJ system were Protestant or Catholic than Muslim was not due to any policy of the TDCJ.  The TDCJ made efforts to recruit more Muslim volunteers, and Muslims who volunteered were treated the same as other volunteers.

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates."[191]  The Muslim inmates who are the plaintiffs in this case do not seek to eliminate the volunteer policy as violative of the Establishment Clause.  Nor do they ask that additional training and resources be provided to Muslim volunteers.  The plaintiffs instead seek an order permitting all Muslim inmates to gather in groups of more than four without direct supervision by prison employees or a volunteer.  That would not vindicate the right to have a state actor cease excessive entanglement with religion.[192]  What the plaintiffs seek indicates that their complaints regarding the volunteer policy and resources devoted to

---

[188] *Turner v. Safley*, 482 U.S. 78, 89 (1987).

[189] *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972).

[190] *Turner*, 482 U.S. at 90 (citations omitted).

[191] *Id.*

[192] *See generally Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971).

implementing volunteers' access to inmates is not grounded in the Establishment Clause. If the volunteer policy were eliminated or fewer resources were expended to support volunteer efforts, inmates, including Muslim inmates, would have fewer opportunities for worship and religious study.

The third *Turner* "consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."[193] "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."[194] If the volunteer policy were eliminated as violative of the Establishment Clause, inmates would be adversely impacted, but resources would no longer be spent by the TDCJ to implement the volunteer program.

The final *Turner* consideration is that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation."[195] "By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."[196] The alternatives to allowing volunteers into the TDCJ prisons to facilitate religious worship and study include excluding the volunteers or paying other individuals to replace them. The first alternative would, as discussed, reduce inmates' religious exercise. The second would require considerable expenditures.

---

[193] *Turner*, 482 U.S. at 90.
[194] *Id.* (citation omitted).
[195] *Id.* (citing *Block v. Rutherford*, 468 U.S. 576, 587 (1984)).
[196] *Id.*

No. 14-20249
c/w No. 14-20444

When assessed under the *Turner* considerations, the volunteer policy and the resources expended to implement it are reasonably related to the TDCJ's obligation to afford inmates reasonable opportunities to exercise religious freedom.

The district court erred in applying strict scrutiny to the claim that the volunteer policy violates the Establishment Clause because fewer Muslims volunteer than Protestants or Catholics and more resources are devoted to Protestant and Catholic volunteers than Muslim volunteers. The TDCJ's policies are facially neutral. The *Larson v. Valente* decision,[197] on which the district court relied,[198] explains that strict scrutiny does not "apply to laws affording a uniform benefit to *all* religions."[199] Seven years after *Larson* was decided, the Supreme Court reiterated, "*Larson* teaches that, when it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions. If no such facial preference exists, we proceed to apply the customary three-pronged Establishment Clause inquiry derived from *Lemon v. Kurtzman*."[200] The *Lemon* inquiry does not employ strict scrutiny.[201] However, for the reasons considered above, we conclude that *Turner*, rather than *Lemon*, provides the proper standard of review.

---

[197] 456 U.S. 228 (1982).

[198] *Brown v. Livingston*, 17 F. Supp. 3d 616, 630 (S.D. Tex. 2014).

[199] *Larson*, 456 U.S. at 252.

[200] *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989) (citing *Larson*, 456 U.S. at 252); *see also In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013) ("As the challenged policies are facially neutral, *Larson* doesn't trigger strict scrutiny, and we proceed to *Lemon*."); *Koenick v. Felton*, 190 F.3d 259, 264 (4th Cir. 1999) ("Strict scrutiny in the Establishment Clause context is to be used to evaluate only those statutes that facially discriminate between religious denominations or between religion and non-religion.") (citing *Hernandez*, 490 U.S. at 695).

[201] *See, e.g., Larson*, 456 U.S. at 252 ("the *Lemon* tests . . . do not reflect the same concerns that warranted the application of strict scrutiny.").

No. 14-20249
c/w No. 14-20444

Brown argues that we should apply the *Lemon* test. The Supreme Court has observed that "just two years after *Lemon* was decided, we noted that the factors identified in *Lemon* serve as 'no more than helpful signposts,'"[202] and "[m]any of our recent cases simply have not applied the *Lemon* test."[203] The Supreme Court then proceeded to apply an "analysis . . . driven both by the nature of the monument and by our Nation's history" to a claim that a Ten Commandments monument displayed on the grounds of the Texas capitol violated the Establishment Clause.[204] The Supreme Court did not apply either strict scrutiny or the *Lemon* factors.[205]

My conclusion that the *Turner v. Safley* standard of review[206] applies, rather than the *Lemon v. Kurtzman* criteria,[207] is informed by these precedents. Additionally, if applied literally, the criteria set forth in *Lemon*

---

[202] *Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (citations omitted); *but see McCreary County v. ACLU of Ky.*, 545 U.S. 844, 859-66 (2005) (applying the *Lemon* factors to displays of the Ten Commandments on the walls of state courthouses, concluding that the purpose of the displays was not secular and therefore violated the Establishment Clause).

[203] *Van Orden*, 545 U.S. at 686 (citations omitted).

[204] *Id.*

[205] *See also Am. Legion v. Am. Humanist Ass'n*, 588 U.S. ___, slip op. at *12-13 (2019) (opinion of ALITO, J.) (plurality opinion) ("*Lemon* ambitiously attempted to distill from the Court's existing case law a test that would bring order and predictability to Establishment Clause decisionmaking. . . . If the *Lemon* Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met." "As Establishment Clause cases involving a great array of laws and practices came to the Court, it became more and more apparent that the *Lemon* test could not resolve them."); i*d.* at *24-25 ("While the *Lemon* Court ambitiously attempted to find a grand unified theory of the Establishment Clause, in later cases, we have taken a more modest approach that focus on the particular issue at hand and looks to history for guidance.").

[206] 482 U.S. 78, 89-90 (1987).

[207] 403 U.S. 602, 612-613 (1971) ("Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'") (citations omitted).

44

are in tension with the obligation the Supreme Court has said prison officials have to afford inmates opportunities to attend religious services and pursue religious studies. The second *Lemon* criterion is that the regulation's "principal or primary effect must be one that neither advances nor inhibits religion."[208] Prison policies that provide opportunities for inmates to worship and pursue religious studies have the purpose of facilitating inmates' exercise of First and Fourteenth Amendment Free Exercise rights and advance religion for those inmates who choose to participate. It is difficult to see how the Supreme Court's jurisprudence could be construed to require prison officials to facilitate religious services and studies and at the same time, to deem prison officials in violation of the Establishment Clause if they do facilitate such religious activities.

The *Lemon* factors could arguably be applied with the acknowledgement that prison officials have an obligation grounded in the First and Fourteenth Amendments to afford inmates reasonable opportunities to exercise their religious beliefs. Viewed through that lens, the secular purpose of a direct supervision policy, when applied to secular as well as religious gatherings, is to maintain safety and security within a prison. The secular purpose of training volunteers who facilitate religious activities or who supervise inmates conducting or participating in religious pursuits is to comply with the constitutional obligation to provide inmates reasonable opportunities to engage in the free exercise of their religious beliefs. Viewed in light of this overarching obligation, the direct supervision policy and the training of volunteers is facially neutral and neither advances nor inhibits any *particular* faith. Here again, it is the paucity of Muslim volunteers as compared to

---

[208] *Id.*

45

Christian volunteers that results in Christian inmates having more opportunities for religious exercise. As to the third *Lemon* factor, a facially neutral policy that provides reasonable opportunities for inmates to exercise their religious beliefs is not excessive governmental entanglement with religion.

**C**

The district court additionally determined that Jewish and Native American inmates were housed in a manner that facilitates the exercise of their religious beliefs, while Muslim inmates were not. The district court concluded this violated the Establishment Clause:

> The fact that Jewish inmates are assigned to four particular units within the prison system *specifically* to bring them closer to Jewish religious volunteers and that Native American inmates are assigned to housing units *specifically* selected to make religions [sic] activities more available to them, while TDCJ makes no effort to house Muslim inmates in units close to the population centers where Muslim volunteers might be recruited, constitutes a clear violation of the Establishment Clause. Prison officials are deliberately favoring Jewish and Native American inmates over Muslim inmates by facilitating their access to religious activities. Thus, TDCJ has intentionally made it easier for Jewish inmates over Muslim inmates to have volunteer-led religious activities. That circumstance alone, in and of itself, constitutes a violation of the Establishment Clause."[209]

---

[209] *Brown*, 17 F. Supp. 3d at 631 (citations omitted). Relatedly, the district court found or concluded:

The TDCJ's inmate assignment policy has not been neutrally applied. To the contrary, unlike Muslim inmates, Jewish inmates are specifically assigned to units in order that they are closer to prospective volunteers. The TDCJ has four units designated for Jewish inmates and Jewish inmates are intentionally located in places where the largest number of Jews reside so as to enhance the opportunity for Jewish inmates to interact with Jewish citizens in religious activities. Likewise, Native American inmates are assigned to a specifically designated unit to facilitate access to each other and to enhance Native American religious activities. By contrast, there are no units designated as

No. 14-20249
c/w No. 14-20444

The record does not support the conclusion that the TDCJ's policies have resulted in greater access to religious exercise for Jewish and Native American inmates as compared to Muslim inmates. There are proportionately more Muslim volunteers than Jewish or Native American volunteers. Nor does the evidence support a conclusion that large numbers of Jewish or Native American inmates are concentrated in a few prison units, even though it is undisputed that four prison units were designated as "Jewish. Nor is there support in the record for the inmates' assertion that Jewish and Native American inmates had more religious services or more access to religious activities than Muslim inmates. I consider the evidence as to each of the district court's findings or conclusion in more detail.

**1**

The TDCJ classified nine faith groups[210] as comprising the category of "Jewish" inmates in May 31, 2013, for purposes of providing information to the parties and the district court in this litigation. That evidence, on which all parties rely, reflects that as of May 31, 2013, there were 922 Jewish inmates housed in 95 of 117 TDCJ prison units. At that time, there were no Jewish chaplains,[211] no certified volunteer chaplains' assistants,[212] "one contract Jewish Chaplain[],"[213] and 15 Jewish or Hebrew volunteers.[214] That is a ratio of one chaplain or volunteer to approximately 58 inmates. Though the district

---

Muslim units in close proximity to Muslim citizen volunteers—that consideration was not contemplated by TDCJ in assigning Muslim inmates to housing units. *Id.* at 629-30.

[210] *See* Parties Joint Ex. 15 (reflecting nine faiths identified by inmates, Nazarite, Jewish, Hebrew, Hebrew Israelite, Orthodox Jew, Shaivite, Kabbalah, Orthodox Hebrew, and Reformed Jewish, as collectively comprising 922 "Jewish" inmates).

[211] Parties Joint Ex. 13.

[212] Parties Joint Ex. 19.

[213] *Brown v. Livingston*, 17 F. Supp. 3d 616, 622 (S.D. Tex. 2014).

[214] Parties Joint Ex. 18.

court concluded that "Jewish inmates are specifically assigned to units in order that they are closer to prospective volunteers,"[215] if that were the intent (and there is no evidence that it was), then significant numbers of Jewish volunteers did not materialize.

By comparison, the undisputed TDCJ data reflects there were 6,775 Muslim inmates (comprised of 12 different Muslim faith groups identified by TDCJ inmates) as of May 31, 2013,[216] who were confined in 113 of the 117 TDCJ units.[217] There were five Muslim chaplains as of that date,[218] no certified volunteer chaplain's assistants,[219] and 222 Muslim volunteers.[220] That results in a ratio of one volunteer or chaplain to approximately 30 Muslim inmates.

A TDCJ employee testified that there have been four units designated for "Jewish" inmates,[221] and one of these was also a "Kosher" unit.[222] The record is sparse as to why four units were designated as "Jewish", and there is no evidence in the record as to how inmates are chosen to be assigned there. The record reflects that the Wynne Unit was designated as a Jewish unit, but the names of the other three units do not appear in the record. A Muslim chaplain and a non-Roman Catholic chaplain were the two chaplains assigned to the Wynne Unit.[223] It housed 2592 inmates who had expressed a faith preference, of whom 28 were Jewish (approximately 1%), 135 were Muslim (approximately 5.2%), and 48 were Native American (1.6%).[224] The Muslim

---

[215] *Brown*, 17 F. Supp. 3d at 629.
[216] Parties Joint Ex. 15.
[217] Parties Joint Ex. 16.
[218] Parties Joint Ex. 14.
[219] Parties Joint Ex. 19.
[220] Parties Joint Ex. 18.
[221] ROA 3214.
[222] ROA 3214.
[223] Parties Joint Ex. 13.
[224] Parties Joint Ex. 16.

chaplain testified that he did not know whether the reason that the Wynne Unit was designated as a "Jewish" unit was so that "volunteers might be more available to the urban areas."[225]  He said that it was his responsibility to "make sure" that the Jewish inmates at the Wynne Unit "have their services" and "their holidays" and that "if they have any problem, they come to me."[226]

As to the other three "Jewish" units, it is clear that none of them housed a large percentage of Jewish inmates.  From an analysis of the Parties Joint Exhibit 16, it can be determined that at most, 21% of the 922 Jewish inmates (as many as 196) were housed within four units designated for Jewish inmates.[227]  The remaining 79% or more of Jewish inmates were housed in 94 other TDCJ units.

There was testimony that an unspecified number of Native Americans have been assigned to an unspecified number of units to make communal worship feasible.[228]  As of May 31, 2013, there were 4,473 Native American inmates[229] housed in 108 of 117 TDCJ units.[230]  Native American inmates were widely distributed among these units.[231]  They were not concentrated in a small number of prison units.  There was one Native American chaplain,[232] no certified volunteer chaplain's assistant,[233] and there were six Native American

---

[225] ROA 3784.

[226] ROA 3784.

[227] Parties Joint Ex. 16.  The record reflects that the Wynne Unit was designated for Jewish inmates (ROA 3784), but does not identify the other three designated units.   There were 28 Jewish inmates housed in the Wynne Unit.  Even assuming that the three designated units other than the Wynne Unit were those with the largest populations of Jewish inmates, then, at most, the number of Jewish inmates housed in "designated" units was 196 out of 922 Jewish inmates, approximately 21%.

[228] ROA 3215-16.

[229] Parties Joint Ex. 15.

[230] Parties Joint Ex. 16.

[231] Parties Joint Ex. 16.

[232] Parties Joint Exs. 13 and 14.

[233] Parties Joint Ex. 19.

volunteers.[234]  That results in a ratio of 1 chaplain or volunteer to 744 Native American inmates.  Native American inmates had access to far fewer chaplains and volunteers than Muslim inmates.

The district court concluded that TDCJ had assigned "Muslim inmates[] primarily to housing units that are long distances from population centers where a significant numbers [sic] of Muslim civilians reside."[235]  The district court detailed evidence of the number of Muslim inmates confined in particular counties as compared to the Muslim populations in those counties.[236]  The district court concluded, "[w]hether it is the intent of the TDCJ to assign Muslim inmates to areas in the state where Muslim volunteers do not reside that, nevertheless, is the effect of unit assignments."[237]  These findings imply that TDCJ could and should house Muslims in prison units closer to larger populations of Muslims.  But there is no evidence that there are any TDCJ prison units that are close to larger populations of Muslims or that it is physically feasible to house 6,775 Muslim inmates near larger populations of Muslims.

Brown's brief in this court implicitly acknowledges that *none* of Texas's prison units are located near Muslim residents.  Brown asserts that the TDCJ has "construct[ed] . . . prison units in areas where there are plentiful Christian volunteers but virtually no Muslim residents anywhere close."  But there is absolutely no evidence that the State of Texas has chosen prison locations based on faith preferences of inmates, the proximity of civilian populations of particular faiths, or to create distances from Muslim civilian populations.

---

[234] Parties Joint Ex. 18.

[235] *Brown v. Livingston*, 17 F. Supp. 3d 616, 623 (S.D. Tex. 2014).

[236] *Id*. at 623-24.

[237] *Id*. at 623.

No. 14-20249
c/w No. 14-20444

**2**

The evidence does not support the conclusion that the assignment of some Jewish and Native American inmates to particular units resulted in greater access to chaplains or volunteers than was available to Muslim inmates. I will nevertheless assume that the TDCJ intentionally assigned some number of Jewish and Native American inmates to specific prison units to facilitate the exercise of their respective religious beliefs but did not do so for any Muslim inmates.

The first consideration under *Turner* is whether such a policy has a valid, rational connection to the governmental interest in providing reasonable opportunities for all inmates to exercise their religious freedom rights. As previously noted, the Supreme Court has recognized that prison officials are not required to provide "identical facilities or personnel" to "every religious sect or group within a prison."[238] Jewish and Native American volunteers were even more scarce than Muslim volunteers. There were no Jewish chaplains, only one paid outside Jewish chaplain, and there was one Native American Chaplain. Assigning some Jewish inmates and some Native American inmates to specific prison units to facilitate the opportunity for religious exercise for those inmates, was reasonable.

The second *Turner* consideration is whether there are alternative means for Muslim inmates to exercise their Establishment Clause rights. Eliminating any favoritism that might have been shown to Muslim inmates is not the remedy that the plaintiffs seek. Nor is there evidence that, had Muslim inmates been housed differently, their opportunities for religious exercise would have been increased.

---

[238] *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972).

No. 14-20249
c/w No. 14-20444

The evidence is silent as to the third *Turner* consideration, which is the impact on guards, other inmates, or the allocation of prison resources generally. With regard to the fourth *Turner* factor, it does not appear that ceasing to assign Jewish and Native American inmates in the way that the TDCJ has done would either decrease the "favoritism" shown to those inmates or increase Muslim inmates' opportunities to worship and study. There is no evidence that Jewish or Native American inmates enjoyed more than one hour of worship each week, or its equivalent. The number of Muslim volunteers exceeded the relative number of Jewish and Native American volunteers even under the TDCJ's existing housing policies, and there is no indication that changing that policy would have any effect other than reducing the opportunities for religious exercise by Jewish and Native American inmates.

The TDCJ's housing policies do not fail *Turner*'s rationality review. The policy does not violate the Establishment Clause.

**D**

Brown argues that the direct supervision policy applies only to religious activities and not to secular ones within TDCJ's prisons and therefore, that the direct supervision policy violates the Establishment Clause. The district court did not ground its finding of an Establishment Clause violation on such a basis.

Brown contends, without any record citations, that band, choir practice, craft shop, and Safe Prison Program classes are indirectly supervised. As a factual matter, the evidence reflects that secular activities in prisons that are not directly supervised almost invariably involve inmates who have been screened for disciplinary violations. Religious gatherings, by contrast, involve inmates with varying security classifications. Applying the *Turner* considerations, there was no Establishment Clause violation.

No. 14-20249
c/w No. 14-20444

The first *Turner* inquiry is whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it."[239]  Two inmates testified that two craft shops at the Robertson Unit were indirectly supervised.[240]  However, another witness testified that craft shops are directly supervised,[241] and the unrefuted testimony was that all inmates in all craft shops were "screened very closely."[242]  Being allowed to go to craft shop was "a kind of a privilege," and "craft shop privileges" could be lost due to disruptive conduct.[243]  The evidence reflects that "[t]here's a big difference between craft shop and religious services."[244]  The evidence was undisputed that TDJC "screen[s] all the offenders in the craft shop . . . very closely," but "these offenders going to all these religious services all across the unit in different custodies" are "not screened and they have gang tendencies and staff assault histories and weapons possessions."[245]  There is therefore "a greater propensity for violence in [TDCJ's] open-call services than these other faith groups that are directly supervised now."[246]  Muslim inmates who attend Jumu'ah are not screened based on disciplinary criteria or offender category.

There was evidence that at one prison in the TDCJ system, the Robertson Unit, a Christian choir was permitted to practice in a multi-purpose room with an officer stationed outside, looking in through a window that went

---

[239] *Turner v. Safley*, 482 U.S. 78, 89 (1987) (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

[240] ROA 2666; 3252-3253; 3264-3267; 4060.

[241] ROA 4058-4060.

[242] ROA 4176.

[243] ROA 4175-76.

[244] ROA 4176.

[245] ROA 4176.

[246] ROA 4176.

from the ceiling to waist level.[247] This occurred for a ten-year period, but choir practice was discontinued by an assistant warden.[248] The record is silent as to whether these inmates were screened based on their disciplinary records or offender category.

With regard to dormitories, the evidence reflected that "dormitory offenders are screened. They're some of [TDCJ's] best offenders and they're not coming from all over the facility."[249] There was also testimony that

> [t]he offenders in the dorm housing area are around each other every day, day in and day out, when they're not working . . . . The offenders that go to programmatic activities such as religious services, they don't have access to each other every day. So, you're more concerned about gatherings that bring offenders from different areas of the facility because of things that they could be doing that is not appropriate for whatever the program is, whether it be religious or education or whatever.[250]

A TDCJ witness testified that other than some of the craft shops and dormitories, there are no situations in which indirect supervision is used.[251] A TDCJ witness testified that inmates are directly supervised when they are in outdoor recreation areas and when in day rooms engaging in other secular activities.[252]

There is a rational connection between the direct supervision policy for religious gatherings of more than four inmates and the legitimate governmental interest in safety and security in prisons. The evidence of

---

[247] ROA 3253; 3263-64.

[248] ROA 3264.

[249] ROA 4205; *see also* ROA 4139-4140.

[250] ROA 3720-21.

[251] ROA 4201; 4205-06.

[252] ROA 4141.

indirect supervision of some secular activities by some inmates, who were screened, does not undermine the rationality of that connection.

The second and third *Turner*[253] factors have been considered above, and that discussion will not be repeated. As to the fourth consideration, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation."[254] Restricting indirectly supervised religious gatherings to inmates who are not security risks would not address legitimate concerns associated with inmate-led services and studies, discussed above.

The district court did not err in failing to conclude that the Establishment Clause was violated because some secular activities by inmates who were screened based on their disciplinary records were permitted to gather for secular activities while indirectly supervised.

## VII

In sum, we hold that the consent decree does not remain necessary to correct current and ongoing violations of RLUIPA, the Free Exercise Clause, or the Establishment Clause. Accordingly, the TDCJ's motion to vacate the consent decree should have been granted.

The district court also awarded attorneys' fees to Brown and the Inmate Intervenors as prevailing parties pursuant to 42 U.S.C. § 1988(b).[255] However, in light of our conclusion as to the merits of the TDCJ's motion to vacate the consent decree, Brown and the Inmate Intervenors are not prevailing parties. We vacate the award of attorneys' fees.

---

[253] *Turner v. Safley*, 482 U.S. 78, 90 (1987) ("A second factor . . . is whether there are alternative means of exercising the right that remain open to prison inmates," and "[a] third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.").

[254] *Id.*

[255] ROA 2021.

No. 14-20249
c/w No. 14-20444

\*       \*       \*

For the foregoing reasons, the district court's denial of the TDCJ's motion to terminate the consent decree and award of attorneys' fees to Brown and the Inmate Intervenors were in error.    The district court's judgment is REVERSED, and the consent decree is terminated.

No. 14-20249
c/w No. 14-20444

KING, Circuit Judge, concurring in part and concurring in the judgment:

I join in Parts I, II, III, IV, V, and VII of Judge Owen's opinion. I do not join in part VI because I would conclude that the Texas Department of Criminal Justice's housing policy violates the Establishment Clause. Nevertheless, the Consent Decree is broader than necessary to remedy this violation. The inmates therefore fail to meet their burden under the Prison Litigation Reform Act to continue the Consent Decree. Accordingly, I also concur in the judgment.[1]

---

[1] The TDCJ filed its notice of appeal in this case more than five years ago. This panel heard oral argument almost four years ago. The panel's delay in deciding this case is inexcusable. I will not invite further delay by writing more.

No. 14-20249
c/w No. 14-20444

JAMES L. DENNIS, Circuit Judge, dissenting:

The district court concluded that portions of the district court's 1977 consent decree were required to prevent a violation of Muslim inmates' rights to religious freedom under the Religious Land Use and Institutionalized Persons Act (RLUIPA). The majority reverses, holding that the Texas Department of Criminal Justice (TDCJ) was not responsible for the substantial burden imposed on Muslim inmates' religious exercise.[1] I disagree, and would affirm the district court's judgment. The TDCJ's current course of action, the "Scott Plan," violates the rights of Muslim prisoners in Texas under the RLUIPA. The Scott Plan imposes a substantial burden on Muslim prisoners' religious exercise, does not further a compelling governmental interest, and, even assuming it furthered some governmental interest, is not the least restrictive means of doing so. The district court recognized this RLUIPA violation and determined that certain provisions of the 1977 consent decree needed to continue in effect to protect Muslim inmates from a continuing violation of RLUIPA. The district court also determined the other requirements of the Prison Litigation Reform Act (PLRA) were satisfied, justifying continuing prospective relief. In reversing the district court as to the RLUIPA violation, the majority seriously errs. For these reasons, I respectfully dissent.

**I**

The consent decree that is the subject of this litigation is the result of a 1977 lawsuit brought by Bobby Brown, a Muslim prisoner who claimed that

---

[1] I do not agree fully with the majority's analysis in other portions of the opinion, such as the Free Exercise and Establishment Clause issues. I do not address these portions of the opinion fully here because the district court should be affirmed solely on the basis of the ongoing violation of RLUIPA.

No. 14-20249
c/w No. 14-20444

Texas prisons unlawfully restricted Islamic religious exercise. The parties resolved the case with the consent decree, which mandated that Muslim prisoners be afforded equal time for religious activities as compared to Protestant, Catholic, and Jewish inmates, or at least no less than two hours a week. The consent decree requires that if a prison-employed chaplain or volunteer is available, he or she shall supervise the gathering. If neither is available, however, it is decreed that Muslim prisoners may gather to conduct their religious services "under appropriate supervision," which has taken the form of indirect supervision. From 1977 to 2012, while the consent decree was in effect, Muslim prisoners gathered for religious services under indirect supervision, with a prison official in the vicinity surveilling intermittently through a window or video and audio surveillance.

In 2009, William Scott, a Jehovah's Witness prisoner of the State of Texas, sued the State claiming that Jehovah's Witnesses, like Muslims, should be allowed to meet for group religious exercise under indirect supervision. Compl. (Dkt. No. 1), *Scott v. Pierce*, No. 4:09-CV-3991 (S.D. Tex. Dec. 11, 2009). The district court in the *Scott* case held the disparate treatment between Jehovah's Witnesses and Muslims violated the Establishment Clause and ordered the State to propose a method of compliance. *Scott v. Pierce*, 4:09-CV-3991, 2012 U.S. Dist. LEXIS 190126, at *15 (S.D. Tex. May 7, 2012) (unpublished). In its attempt at compliance, the State submitted the Scott Plan, which required direct supervision for all religious services, including Muslim services. Proposed Compliance Plan (Dkt. No. 69), *Scott v. Pierce*, No. 4:09-CV-3991 (S.D. Tex. Sept. 4, 2012). In practice, the Scott Plan—requiring direct supervision of all religious services—contravened the consent decree—requiring that Muslim prisoners be permitted to gather "under appropriate supervision" where direct supervision was unavailable.

59

No. 14-20249
c/w No. 14-20444

Because the Scott Plan directly conflicts with the consent decree, the TDCJ moved in August 2012 to terminate the consent decree pursuant to the PLRA.[2]  The district court denied TDCJ's motion, finding that the portions of the consent decree that afford Muslim prisoners the right to equal time for religious exercise as afforded to prisoners of other faiths were necessary to prevent the violation of a federal right.  Although TDCJ appeals from that denial, it failed to challenge the district court's underlying factual findings in its opening brief.

## II

The majority holds that the district court erred in finding a continuing violation of RLUIPA.  That statute provides that the government shall not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government can prove that the substantial burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1.  The majority does not dispute the undoubtedly substantial burden imposed on Muslim inmates by the Scott Plan.  Instead, the majority holds that any burden placed on Muslim inmates was not, as a matter of law, caused by the TDCJ.  In my view, this conclusion is based on an erroneous reading of our case law in this area.

---

[2] Under the PLRA, the filing of a motion to terminate automatically stays the effectiveness of a consent decree issued pursuant to that statute.  18 U.S.C. § 3626(e).  After the district court denied the motion to terminate the consent decree, this court continued the PLRA's stay of the consent decree pending appeal, such that since 2012, the consent decree has not been in effect and Muslim inmates have been subjected to the Scott Plan, under which they are not afforded the opportunity to meet without direct supervision.

60

No. 14-20249
c/w No. 14-20444

## A

The majority opinion's principal conclusion with respect to plaintiffs' RLUIPA claim is that, as a matter of law, the TDCJ did not cause the substantial burden Muslim inmates faced. Instead, the majority reasons, the substantial burden on Muslim inmates was caused by the lack of outside volunteers available to supervise Muslim services. The majority's reasoning draws on a single line from *Adkins v. Kaspar*, in which a panel of this court stated that the burden on the religious exercise of members of the Yahweh Evangelical Assembly (YEA) in Texas prisons "results . . . from a dearth of qualified outside volunteers . . ., not from some rule or regulation that directly prohibits such gatherings." 393 F.3d 559, 571 (5th Cir. 2004). However, the majority ignores *Adkins*'s further admonition that analyzing whether a substantial burden exists under RLUIPA "requires a case-by-case, fact-specific inquiry," because we have not "craft[ed] a bright-line rule." *Id.* at 571. Here, the majority flouts this cautionary language by converting a single sentence in *Adkins* into a bright-line rule that Texas inmates cannot establish causation against TDCJ with respect to the requirement that they be directly supervised for religious services.

Although *Adkins* itself reveals the error in the majority's analysis, this panel is not the first to interpret *Adkins*. In *Mayfield v. Texas Department of Criminal Justice*, 529 F.3d 599 (5th Cir. 2008), we held that the TDCJ violated RLUIPA by applying the direct-supervision rule—the same rule at issue in this case—to Odinist inmates. 529 F.3d at 614–15. *Mayfield* distinguished *Adkins* because, unlike in *Adkins*, where "the volunteer policy was implemented uniformly," uneven application of the direct-supervision policy in *Mayfield* "suggest[ed] that the burden [was] at least partially imposed by the TDCJ's disparate application." *Id.* at 614. The majority acknowledges *Mayfield* but

61

No. 14-20249
c/w No. 14-20444

argues that *Adkins* nevertheless controls because "[t]he direct supervision requirement under the Scott Plan has been imposed uniformly, as it was in *Adkins*." *Supra* Part IV. I disagree. *Adkins* is distinguishable for at least two reasons.

First, as in *Mayfield*, there is evidence here that the TDCJ causes different religious groups to be treated differently. The district court explicitly found that "unlike Muslim inmates, Jewish inmates are specifically assigned to units in order that they are closer to prospective volunteers," and "[l]ikewise, Native American inmates are assigned to a specifically designated unit to facilitate access to each other and to enhance Native American religious activities." These factual findings were not challenged on appeal by TDCJ.[3] This inconsistency between treatment of Muslim inmates versus Native American and Jewish inmates reflects that, although the direct-supervision policy on its face may appear to apply uniformly, the extent of its effects has been intentionally tempered with respect to some, but not other, groups. This, like the evidence in *Mayfield* of inconsistent application of the policy, "suggest[s] that the burden is at least partially imposed by the TDCJ's disparate application." *Mayfield*, 529 F.3d at 614; *see also Newby v. Quarterman*, 325 F. App'x 345, 350 (5th Cir. 2009) (distinguishing *Adkins* and holding that "total lack of approved Buddhist volunteers" and the resulting "preclu[sion of] members of the Buddhist faith . . . from meeting" reflected a substantial burden caused by the State under RLUIPA).

Second, in finding that the TDCJ did not cause the substantial burden suffered by YEA adherents, *Adkins* gave significant weight to the fact that two

---

[3] The TDCJ argues for the first time in its reply brief that the district court made clear errors of fact, but this court does not consider arguments first raised in a reply brief. *See United States v. Prince*, 868 F.2d 1379, 1386 (5th Cir. 1989).

No. 14-20249
c/w No. 14-20444

additional individuals would soon become volunteers, providing a significant addition of volunteers for the small group of 25 to 30 YEA prisoners at issue in that case. *See* 393 F.3d at 571. The district court's findings indicate no such alleviation will ever occur for Muslim inmates. Contrary to *Adkins*, there is evidently no hope here for future additional Muslim volunteers, because (1) "[a] large number of Muslim inmates are assigned to units that are located predominately in remote areas of the state where few Muslim civilians reside" to serve as volunteers, (2) the Muslim practice of "Jum'ah . . . must occur shortly after midday on Fridays, a day when potential volunteers are at work and unable to travel to prison units to participate" whereas "Protestant services are commonly held on weekends," and (3) unlike the 25 to 30 YEA adherents in *Adkins*, for whom an additional two volunteers would make a meaningful impact, "approximately 6,775 inmates have expressed a religious preference for the Muslim group" in Texas prisons.

Accordingly, the majority's conclusion that the TDCJ did not cause the substantial burden imposed on Muslim inmates is incorrect, and its reliance on *Adkins* to reach that conclusion is misplaced, as *Adkins* is distinguishable. The district court correctly found that the Scott Plan imposed a substantial burden on Muslim inmates' religious exercise, and I would affirm that finding.

**B**

Because the majority finds that TDCJ did not cause the substantial burden on Muslim inmates' religious freedom, it finds no continuing RLUIPA violation and does not reach RLUIPA's other elements or the PLRA's requirements for continuing the consent decree. As discussed, I would affirm the district court's finding that the TDCJ created a substantial burden on Muslim inmates through application of the Scott Plan. I will therefore analyze RLUIPA's additional requirements that the substantial burden is in

63

furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *See* 42 U.S.C. § 2000cc-1. The Scott Plan violates RLUIPA if the TDCJ fails to meet either prong. And if an RLUIPA violation is found, the PLRA's remaining requirements must be analyzed as they apply to the consent decree—whether the decree extends no further than necessary to correct the RLUIPA violation and is narrowly drawn and the least intrusive means to correct that violation. *See* 18 U.S.C. § 3626(b)(2)-(3). The district court found that (1) the TDCJ failed to demonstrate that the Scott Plan serves a compelling governmental interest or is the least restrictive means for furthering that interest; and (2) the remaining requirements of a PLRA for continuing the consent decree were met. Because the district court was correct on both fronts, I would affirm.

**1**

In order to escape an RLUIPA violation once a substantial burden has been established, the TDCJ must show the Scott Plan "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)–(2). The TDCJ did not meet either requirement.

As for the first requirement, instead of articulating a specific compelling interest, the TDCJ argues that, as a matter of law and based on security concerns, the direct-supervision policy advances a compelling governmental interest. Such generalized assertions fail to meet the fact-specific and individualized inquiry required by RLUIPA. *See Tagore v. United States*, 735 F.3d 324 (5th Cir. 2013)[4] (substantial burden analysis in "RFRA requires the

---

[4] The fact that *Tagore* is a RFRA rather than RLUIPA case renders it no less applicable here. *See Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005) ("Congress carried over

No. 14-20249
c/w No. 14-20444

government to explain how applying the [burdensome policy at issue] '*to the person*' whose sincere exercise of religion is being seriously impaired furthers the compelling governmental interest"); *see also McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 475 (5th Cir. 2014) ("[T]he governmental interest cannot be 'couched in very broad terms' but must be 'focused' on the particular claimant whose interest is substantially burdened."). Citing to testimony that Muslim inmates and chaplains were not aware of serious disciplinary incidents, as well as the fact that "[t]here are no written disciplinary reports of incidents involving indirectly supervised or inmate-led Muslim religious services," the district court specifically found there was no evidence that inmate-led religious services posed a security risk. The district court found that indirectly-supervised Muslim religious services posed no safety concerns. These fact findings are unchallenged on appeal and are conclusive that, as the district court found, "the TDCJ administrator's contention that the presence of an outside volunteer furthers its compelling state interest in prison security is unfounded and contradicted by the evidence." The TDCJ, then, fails to meet the first requirement that the Scott Plan furthers a compelling government interest. *See* 42 U.S.C. § 2000cc-1(a)(1).

TDCJ also fails to meet the second requirement. Even assuming some broad compelling interest in safety and security, the Scott Plan is clearly not the least restrictive means to furthering any such interest. *See* 42 U.S.C. § 2000cc-1(a)(2). Taking the district court's findings at face value, as we must, less restrictive means exist. For example, simply allowing Muslim inmates to

---

from RFRA [to RLUIPA] the 'compelling governmental interest'/'least restrictive means' standard."); *Longoria v. Dretke*, 507 F.3d 898, 904 (5th Cir. 2007).

continue holding inmate-led services is clearly sufficient to further the government's interest. As the district court pointed out, "TDCJ's experience during the thirty-five years of inmate-led services demonstrates that less restrictive means are available and that they fulfill TDCJ's security concerns while not burdening the Muslim inmates' exercise of their religious practices." The TDCJ, therefore, has failed to establish that the Scott Plan is the least restrictive means of furthering its interest. *See* 42 U.S.C. § 2000cc-1(a)(2).

**2**

The PLRA's requirements for continuing the consent decree are also met. The PLRA mandates that the consent decree remain in place if it (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3). As previously explained, the consent decree remains necessary to correct the ongoing violation of Muslim prisoners' rights under RLUIPA, satisfying the first prong. *See id.* Given that the consent decree specifically alleviates the burdens imposed on Muslim inmates by precluding application of a direct-supervision rule to them—the very rule that violates RLUIPA—the consent decree "extends no further than necessary" and "is narrowly drawn and the least intrusive means." *Id.*

For these reasons, I would affirm the district court's continuation of the consent decree to protect Muslim inmates in Texas from a continuing violation of federal law.

**III**

Because, in my view, an ongoing violation of federal law justifies the district court's refusal to vacate the entire consent decree as the TDCJ requested, I would not reach the Establishment Clause and Free Exercise

Clause violations. However, I am compelled to note two additional issues with the opinion. First, Judge Owen's discussion of the Muslim inmates' Establishment Clause rights, which failed to garner majority support and is therefore not binding precedent, would unnecessarily create a circuit split.[5] Second, both Judge Owen's lone discussion of the Establishment Clause, and, on behalf of a majority, her Free Exercise analysis, overstep the bounds of appellate review by retrying the facts of this case de novo despite that the district court's factual findings go unchallenged on appeal. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (This court "must constantly have in mind that [its] function is not to decide factual issues de novo." (cleaned up)); *United States v. Nieto*, 721 F.3d 357, 372 (5th Cir. 2013) (finding that challenges to the district court's fact-finding were waived for failure to brief).

**\*\*\***

For these reasons, I respectfully dissent.

---

[5] Judge Owen's opinion applies deference under *Turner v. Safley*, 482 U.S. 78 (1987) in the context of the Establishment Clause, even though no other circuit has done so in a published case. *See Americans United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 426 (8th Cir. 2007) (explaining that the Eighth Circuit has "consistently analyzed Establishment claims without mentioning the *Turner* standard, even when applying that standard to Free Exercise claims in the same case"); *Maye v. Klee*, 915 F.3d 1076, 1085 (6th Cir. 2019) (declining to decide whether to apply *Turner* or analyze under strict scrutiny because the violation was clear under either standard); *Kerr v. Farrey*, 95 F.3d 472, 480 (7th Cir. 1996) (applying *Lemon v. Kurtzman*, 403 U.S. 602 (1971) and reversing after district court applied *Turner* and found no Establishment Clause violation); *see also Williams v. Lara*, 52 S.W.3d 171, 188 (Tex. 2001) (following "an overwhelming majority of . . . courts" in declining to apply *Turner* to Establishment Clause claims); *Scott v. Pierce*, No. CV H-09-3991, 2012 WL 12535442, at \*3 (S.D. Tex. May 7, 2012) (declining to apply *Turner* to Establishment Clause claims); *Muhammad v. City of N.Y. Dep't of Corr.*, 904 F. Supp. 161, 195-99 (S.D.N.Y. 1995) (applying *Turner* to Free Exercise claims but not to Establishment Clause claims stemming from the jail's refusal to provide inmates with Nation of Islam ministers and services).